ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

DANIEL PASTOR (CABN 297948)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Fax: (415) 436-7234
    daniel.pastor@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 20-CR-452-EMC-1 |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | Judge: Hon. Edward M. Chen |
| FRANCISCO MIRANDA, | Date: August 10, 2023 |
| Defendant. | Time: 9:00 a.m. |

I.  **INTRODUCTION**

    Defendant Francisco Miranda (age 37) has pleaded guilty to Count One of the captioned Indictment charging him with Conspiracy to Distribute Five Kilograms and More of a Mixture and Substance Containing Cocaine.  Dkt. 143.  A wiretap investigation by the DEA in this case showed that Miranda conspired with others to secure large quantities of cocaine from Mexico and Southern California, which he in turn supplied to other Bay Area drug traffickers.  PSR ¶ 12.  DEA agents also observed Miranda visiting a drug stash house in Mountain View, California that was later found to

contain over 10 kilograms of methamphetamine when it was searched on the day of Miranda's arrest. PSR ¶ 43.

## II.    SENTENCING GUIDELINES CALCULATIONS

As reflected in the Plea Agreement and the Presentence Report ("PSR"), the Sentencing Guidelines calculation for the defendant's offense is as follows:

|   |   |   |
|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2D1.1(c)(5) | 30 |
| b. | Acceptance of Responsibility, U.S.S.G. § 3E1.1: | -3 |
| c. | Total Offense Level: | 27 |

*See* Dkt. 143 at 6; PSR ¶¶ 48-57.  The parties reached no agreement on the defendant's criminal history category (CHC).  The government agrees with U.S. Probation that the defendant is in criminal history category (CHC) II.  PSR ¶¶ 60-61.[1]  The sentencing guidelines range is 78-97 months (PSR ¶ 91) with a mandatory sentence of 120 months because the safety-valve criteria have not been met (PSR ¶ 91).

## III.   GOVERNMENT'S VIEW OF THE OFFENSE AND SECTION 3553 FACTORS

### A.    Legal Standards

The Court must impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; and to protect the public. 18 U.S.C. § 3553(a)(2); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The Guidelines are "the starting point and the initial benchmark" but are not binding. *Gall v. United States*, 552 U.S. 38, 49 (2007).

Section 3553(a) sets forth factors that the Court must consider in determining a sentence: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the purposes of sentencing; (3) the kinds of sentences available; (4) the Guidelines range for sentences; (5) any pertinent policy statements; (6) the need to avoid unwarranted sentencing disparities.  18 U.S.C. § 3553(a); *Carty*, 520 F.3d at 991.

---

[1] The sentencing date for the defendant's 2010 conviction was July 7, 2010. PSR ¶ 60.  The offense conduct in this case began not later than March 29, 2020.  PSR ¶ 11 n.1.  Accordingly, pursuant to U.S.S.G. § 4A1.1(b), the prior sentence was not imposed more than ten years before "the commencement of the instant offense." *Id.*; *see also* U.S.S.G. § 4A1.2 appl. n. 7 ("the term 'commencement of the instant offense' includes any relevant conduct.").

GOV. SENTENCING MEMO.
NO. 3:20-CR-452-EMC-1

B.    **Offense Conduct**

1.    **The Drug Conspiracy**

Beginning around December 2019, the DEA learned of the Miranda's cocaine distribution through a wiretap of one of his customers—Defendant Raudel Macias, charged in Case No. CR 21-26-EMC).  Dkt. 1 ¶ 15.  On February 18, 2020, agents intercepted a call between Raudel Macias and Miranda in which the two discussed the quality of drugs that Raudel Macias was receiving. Other intercepted calls reference payments Macias was making to Miranda.  *Id.* Still other calls discuss the appearance and potency of cocaine being supplied by Miranda.  *See* CR 21-026, Dkt. 242 Declaration of Daniel Pastor, Exhibit 1 (15-Day Wiretap Report) (filed under seal).

Intercepted calls and texts from the wiretaps show that that Miranda and his co-defendants Jesus Alberto Rojas and Gelacio Perez were operating a wholesale cocaine trafficking and distribution operation that trafficked kilogram quantities of cocaine from Southern California to Northern California and resold to street-level distributors such as defendant Raudel Macias. PSR ¶ 12; Dkt. 1 ¶¶ 15-16. Based on intercepted calls between Miranda and his father in Mexico and between Miranda and his co-conspirators, the government believes that Miranda was a central figure in the cocaine trafficking operation who coordinated cocaine re-supply shipments with drug traffickers in Southern California. PSR ¶ 14.  The DEA wiretap investigation of Miranda led to three significant seizures of cocaine and methamphetamine that occurred on April 9, 2020, June 14, 2020, and on November 17, 2020—when Miranda was arrested.

2.    **April 9, 2020 Seizure of 5 Kilograms of Cocaine**

Around April 9, 2020, Miranda arranged to have his co-conspirator Jesus Alberto Rojas pick up 5 kilograms of cocaine which was discussed in several intercepted calls and texts. Two days earlier, on April 7, 2020, DEA agents followed Miranda and Rojas to Garden Grove in Southern California and observed Miranda meeting with a Southern California drug supplier (Supplier-1) at a shopping center for about an hour. PSR ¶ 15; Dkt. 1 ¶ 19. After the meeting, Miranda and Rojas drove back to the Bay Area. *Id.*  The next day—April 8, 2020—Miranda spoke to his father in Mexico about the April 7 Southern California drug meeting.  PSR ¶ 16.  Miranda told his father that he looked at the product and been told

it was not that good.  PSR ¶ 17.  Despite the inferior quality of the cocaine, agents believe that Miranda had been instructed to purchase five kilograms of cocaine to generate continued cash flow[2] for the drug operation.  *Id.*  Miranda told his father that he would be sending someone to Southern California to pick up the "five" the next day.  *Id.*  Later, Miranda spoke to Rojas by phone, and they agreed that Rojas would travel to Los Angeles early the next morning.  PSR ¶ 18.

On April 9, 2020, agents followed Rojas from Northern California to Garden Grove in Southern California where Rojas met with Supplier-1—the same drug supplier that agents had observed Miranda meet on April 7.  PSR ¶ 19. Supplier-1 gave Rojas a large grocery bag.  *Id.*  After the meeting, Rojas drove back toward Northern California.  Near Santa Maria, California on Highway 1, the California Highway Patrol (CHP) stopped Rojas for speeding.  *Id.*  Rojas gave officers consent to search his vehicle but then attempted to flee the scene before being apprehended.  PSR ¶ 20.  CHP officers found five bricks of cocaine inside Rojas's vehicle.  *Id.* The cocaine was later tested at a DEA laboratory and tested positive for cocaine with a net weight of approximately 4,985 grams.  *Id.*  Due to the pandemic health emergency, Rojas was released from state custody and subsequently fled to Mexico.

### 3.    June 2020 Cocaine Seizure

In June 2020, the DEA learned that Miranda was seeking a re-supply of cocaine.  PSR ¶ 21. Starting on June 12, 2020, agents intercepted calls in which Miranda arranged to obtain a shipment of cocaine from Southern California and to distribute that cocaine once it arrived in the Bay Area.  PSR ¶¶ 22-25.  For example, on June 12, 2020, agents intercepted a call between Miranda and a drug courier in which Miranda indicated that he may need the courier to make a trip the following day (PSR ¶ 22):

Miranda:      "The people said perhaps in the morning it would be needed."

USER-0962:   "Early Tomorrow?"

Miranda:      "Yes, if it happens, it would be around noon, so you can head out."

USER-0962:   "oh, ok. So you will want me to go tomorrow?"

Miranda:      "Well, let them notify me first."

---

[2] The Covid-19 pandemic had begun in mid-March 2020.  As with legitimate economic activity, the pandemic caused a major disruption in the flow of illegal drugs across the U.S.-Mexico border.

[Follow-up call later that night]

Miranda:     "Can you come over here, and so you can head out around like at 7?"

USER-0962:   "At 7 in the morning?"

Miranda:     "But if you want to come right now so I can give you the, something." [probably referring to purchase money]

The next day—June 13, 2020—Miranda was intercepted as he spoke to one of his customers and discussed how much of the cocaine shipment would go to that customer. PSR ¶ 25.  In coded language, Miranda offered 3 kilograms of cocaine to the customer at $28,500 per kilogram.  *Id.*  Later that day, Miranda was intercepted as he spoke to his drug courier, who had arrived in Southern California, and gave instructions in coded language indicating that the courier was picking up a total of 12 kilograms. PSR ¶¶ 27, 32.  Later, Miranda received an incoming text from the courier stating: "it is done, my man" (meaning that the pick-up was completed and that the courier was on his way back).  Dkt. 1 ¶ 33. Miranda then reported to one of his customers that the shipment was on its way, and Miranda provided the courier's phone number to the customer.  Dkt. 1 ¶¶ 34-35.

On June 14, 2020, Miranda's co-defendant Gelacio Perez[3] was intercepted on a call arranging to sell some of the cocaine that had just arrived.  Dkt. 1 ¶¶ 51-54.  In addition, one of Miranda's customers called Miranda and asked to return some of the product because of its poor quality (PSR ¶ 33):

USER-5322:   "They told me to call you. It was already known that we were coming so that you could exchange those, I think. I don't know if, I still haven't checked too well there. I told my brother to take a good look and see if it was one or two. It had come out kind of ugly."

In later calls, Miranda indicated that he had one left to exchange, which agents understood to mean that he had one kilogram of cocaine remaining to sell.  PSR ¶ 35.  Miranda indicated that this kilogram was marked "1A."  PSR ¶¶ 37-38.

On June 14, 2020, agents surveilled a customer arriving at Miranda's stash house in Mountain View, California.  PSR ¶¶ 39-40.  After the customer left, Hayward Police stopped the customer who

---

[3] Gelacio Perez evaded arrest and is now believed to be in Mexico.

GOV. SENTENCING MEMO.
NO. 3:20-CR-452-EMC-1

1   was driving without a license. PSR ¶ 40.  In the customer's vehicle, Hayward Police found roughly a

2   kilogram of cocaine (997 grams net weight) with the letters "1A" stamped into the cocaine brick.

3       **4.     November 17, 2020 Stash House Seizure of 10 Kilograms of Methamphetamine and Other Suspected Narcotics**

4

5       Federal agents arrested Miranda at his home on November 17, 2020. Agents seized about

6   $105,130 in cash from a dresser in his bedroom.  PSR ¶ 42.  During the arrest, Miranda attempted to

7   destroy his mobile phone by breaking it in half.  Dkt. 12 at 5.  Agents also searched the Mountain View

8   stash house that the drug customer had visited on June 14, 2020.  PSR ¶ 43. At the stash house, agents

9   found over 10 kilograms of methamphetamine as well as other suspected narcotics.  *Id.*  In addition,

10  agents seized a stamp-press press used to imprint symbols on powder substances such as cocaine.

11      **C.     The 3553(a) Factors**

12      The government agrees with the Probation Officer that the defendant's impoverished childhood,

13  health conditions, and likely removal from the United States following his sentence are factors under 18

14  U.S.C. § 3553(a) which the Court should consider.  The government agrees with the Probation officer

15  that Miranda's role as a whole drug supplier was a serious offense and that a significant sentence is

16  warranted to punish and deter this conduct.

17  **IV.    CONCLUSION**

18      Because the safety valve criteria have not been satisfied in this case, the government respectfully

19  recommends that the Court impose a sentence of 120 months in prison, five years of supervised release,

20  a special assessment of $100, and the conditions recommended by U.S. Probation in the Presentence

21  Report.

22

23  DATED:  August 3, 2023                          Respectfully submitted,

24

25                                                  ISMAIL J. RAMSEY
                                                    United States Attorney

26
                                                    */s/ Daniel Pastor*
27                                                  DANIEL PASTOR
                                                    Assistant United States Attorney

28

                                            6
GOV. SENTENCING MEMO.
NO. 3:20-CR-452-EMC-1